Christopher Berry, State Bar No. 283987
Matthew Liebman, State Bar No. 248861
cberry@aldf.org
ANIMAL LEGAL DEFENSE FUND
525 E. Cotati Ave.
Cotati, CA 94931
Tel: 707.795.2533/Fax: 707.795.7280

Margaret B. Kwoka (Admitted *Pro Hac Vice*)
mkwoka@law.du.edu
UNIVERSITY OF DENVER STURM COLLEGE OF LAW
2255 E. Evans Ave
Denver CO 80208
Tel: 303.871.6275/ Fax: 303.871.6378

Attorneys for Plaintiffs

John S. Rossiter, State Bar No. 151113
JRossiter@perkinscoie.com
Lindsey E. Dunn (*Pro Hac Vice* Application pending)
LDunn@perkinscoie.com
PERKINS COIE LLP
505 Howard Street, Suite 1000
San Francisco, CA  94105-3204
Tel:  415.344.7000/ Fax: 415.344.7050

Attorneys for Animal Legal Defense Fund

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ANIMAL LEGAL DEFENSE FUND, STOP ANIMAL EXPLOITATION NOW, COMPANION ANIMAL PROTECTION SOCIETY, and ANIMAL FOLKS,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF AGRICULTURE and ANIMAL AND PLANT HEALTH INSPECTION SERVICES,<br><br>Defendants. | Case No. 3:17-cv-00949<br><br>**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Dept: Courtroom 2, 17th Floor<br>Judge: Hon. William H. Orrick<br>Hearing Date: May 10, 2017<br>Hearing Time: 2:00 p.m. |

1

**TABLE OF CONTENTS**

2   I.     NOTICE OF MOTION AND RELIEF SOUGHT ............................................... 1

3   II.    STATEMENT OF FACTS ............................................................................... 1

    III.   STATEMENT OF ISSUES .............................................................................. 3
4
    IV.    ARGUMENT .................................................................................................. 3
5
           A.    Plaintiffs Will Likely Succeed on the Merits of Their Claims ................ 4
6
                 1.    Defendants have failed to make records affirmatively available as
7                        required by the Freedom of Information Act .................................. 4

                       a.    All records in the APHIS databases constitute frequently
8                                requested records required to be made affirmatively
                                 available under FOIA ........................................................ 5
9
                       b.    In the alternative, the vast majority of records in the APHIS
10                                databases constitute agency orders required to be made
                                 affirmatively available under FOIA ................................. 7
11
                 2.    Defendants acted arbitrarily and capriciously in violation of the
12                       Administrative Procedures Act by suddenly removing databases
                         from the APHIS website that have been continually published for
                         years in the name of "transparency." .............................................. 9
13
                       a.    Removal of the databases constitutes a final agency action .......... 9
14
                       b.    The agency's decision to remove the APHIS databases is
                                 arbitrary, capricious, and an abuse of discretion ............... 11
15
           B.    Plaintiffs Will Suffer Irreparable Harm from Defendant's FOIA and APA
16                 Violations Absent a Preliminary Injunction ........................................ 13

                 1.    Plaintiffs' diversion of resources and frustration of mission from
17                       Defendant's FOIA and APA violations is irreparable harm because
                         neither statute provides compensatory damages ............................ 13
18
                 2.    Plaintiffs' will be irreparably harmed by the loss of member and
19                       donor goodwill .......................................................................... 17

           C.    The Balance of Hardships and Public Interest Favor an Injunction ........ 18
20
    V.     CONCLUSION AND RELIEF REQUESTED .................................................. 19

21

22

23

24

25

26

27

28

i

# TABLE OF AUTHORITIES

**CASES**

*Abramowitz v. EPA,*
    832 F.2d 1071 (9th Cir. 1987), *superseded by statute on other grounds as
    recognized by Hall v. EPA*, 263 F.3d 926 (9th Cir. 2001) .......................................10

*Alliance for the Wild Rockies v. Cottrell,*
    632 F.3d 1127 (9th Cir. 2011).....................................................................................3, 4

*Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife,*
    273 F.3d 1229 (9th Cir. 2001).......................................................................................11

*Bennett v. Spear,*
    520 U.S. 157 (1997).......................................................................................................10

*Cal. Pharmacists Ass'n v. Maxwell-Jolly,*
    563 F.3d 847 (9th Cir. 2009), *modified on other grounds* .......................................13

*Cohen v. United States,*
    650 F.3d 717 (DC Cir. 2011) ........................................................................................13

*Elec. Frontier Found. v. Office of the Dir. of Nat'l Intelligence,*
    542 F. Supp. 2d 1181 (N.D. Cal. 2008) ........................................................................4

*Fair Hous. of Marin v. Combs,*
    285 F.3d 899 (9th Cir. 2002).........................................................................................13

*FCC v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2009).......................................................................................................11

*Havens Realty Corp. v. Coleman,*
    455 U.S. 363 (1982).......................................................................................................13

*Idaho v. Coeur d'Alene Tribe,*
    794 F.3d 1039 (9th Cir. 2015)........................................................................................13

*Judulang v. Holder,*
    565 U.S. 42 (2011).........................................................................................................11

*League of Wilderness Defs. v. Connaughton,*
    752 F.3d 755 (9th Cir. 2014).........................................................................................17

*Martins v. U.S. Citizenship & Immigration Servs.,*
    962 F. Supp. 2d 1106 (N.D. Cal. 2013) .........................................................................4

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.,*
    463 U.S. 29 (1983).........................................................................................................11

ii

*N.D. ex rel. Parents v. Haw. Dep't of Ed.*,
   600 F.3d 1104 (9th Cir. 2010) ............................................................................................4

*Navajo Nation v. U.S. Dep't of Interior*,
   819 F.3d 1084 (9th Cir. 2016) ..........................................................................................10

*NLRB v. Brown*,
   380 U.S. 278 (1965) ..........................................................................................................11

*NLRB v. Robbins Tire & Rubber Co.*,
   437 U.S. 214 (1978) ............................................................................................................4

*NLRB v. Sears, Roebuck, & Co.*
   421 U.S. 132 (1975) ............................................................................................................8

*Pacific Radiation Oncology, LLC v. Queen's Medical Center*,
   555 Fed. Appx. 730 (9th Cir. 2015) ..................................................................................17

*Regents of Univ. of Cal. v. American Broadcasting Cos.*,
   747 F.2d 511 (9th Cir. 1984) ............................................................................................17

*Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*,
   944 F.2d 597 (9th Cir. 1991) ............................................................................................17

*Roman v. Nat'l Reconnaissance Office*,
   952 F. Supp. 2d 159 (D. D.C. 2013) .................................................................................13

*Sackett v. EPA*,
   566 U.S. 120 (2012) ..........................................................................................................10

*SEC v. Chenery Corp.*,
   332 U.S. 194 (1947) ..........................................................................................................11

*Textile Unlimited, Inc. v. A..BMH & Co.*,
   240 F.3d 781 (9th Cir. 2001) ..............................................................................................4

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
   136 S. Ct. 1807 (2016) ......................................................................................................10

*Willamette Indus., Inc. v. United States*
   530 F. Supp. 904 (D. Or. 1981), *aff'd* 689 F.2d 865 (9th Cir. 1982) ................................8

*Winter v. Natural Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) .........................................................................................................3, 18

**STATUTES**

5 U.S.C. § 551(6) ....................................................................................................................8

5 U.S.C. § 552(a)(2) ...............................................................................................................5

iii

5 U.S.C. § 552(a)(2)(A) ...........................................................................................................7

5 U.S.C. § 552(a)(2)(D) ...................................................................................................5, 7, 9

5 U.S.C. § 552(a)(4)(B) ...........................................................................................................5

5 U.S.C. § 552(a)(6)(A) ...........................................................................................................3

5 U.S.C. § 552(b)(6) ...............................................................................................................12

5 U.S.C. § 552(b)(7)(C) ..........................................................................................................12

5 U.S.C. § 702 ...........................................................................................................................5

5 U.S.C. § 704 ......................................................................................................................5, 9

5 U.S.C. § 706 ...........................................................................................................................5

5 U.S.C. § 706(2)(A) ..............................................................................................................11

7 U.S.C. § 2131 .........................................................................................................................1

7 U.S.C. § 2132 .........................................................................................................................1

**RULES**

Fed. R. Civ. Proc. 65 ................................................................................................................1

**REGULATIONS**

7 C.F.R. § 1.4(a)(4) ..................................................................................................................5

7 C.F.R. § 1.4(f) .......................................................................................................................7

9 C.F.R. § 1.1 ............................................................................................................................1

9 C.F.R. § 2.1 *et seq.* ...............................................................................................................1

9 C.F.R. § 3.1 *et seq.* ...............................................................................................................1

**OTHER AUTHORITIES**

H.R. Rep. No. 104-795 (1996) .................................................................................................5

iv

## I.  NOTICE OF MOTION AND RELIEF SOUGHT

PLEASE TAKE NOTICE THAT at 2:00 p.m. on May 10, 2017, or as soon thereafter as counsel may be heard, in the courtroom of the Honorable William H. Orrick, courtroom 2 located on the 17th Floor of the Federal Courthouse at 450 Golden Gate Avenue, San Francisco, California, Plaintiffs will, and hereby do, move for a preliminary injunction pursuant to Fed. R. Civ. Proc. 65.

On February 3, 2017, the United States Department of Agriculture ("USDA") removed from the public domain all of the records documenting the Animal and Plant Health Inspection Service's ("APHIS") enforcement of the Animal Welfare Act ("AWA"). To remove the documents, USDA took "the entire agency search tool database . . . off line." USDA, *AWA Inspection and Annual Reports*, https://www.aphis.usda.gov/aphis/ourfocus/animalwelfare/sa_awa/AWA-Inspection-and-Annual-Reports (last modified Mar. 10, 2017). Plaintiffs seek a preliminary injunction to the *status quo ante*, requiring USDA to continue its years-long practice of allowing public access to the continually updated records in the APHIS databases pending the outcome of the litigation.

## II.  STATEMENT OF FACTS

The AWA sets minimum standards for the humane treatment of animals by certain commercial enterprises including animal breeders, animal exhibitors, and animal research facilities. *See* 7 U.S.C. § 2132; 9 C.F.R. § 1.1. USDA, through APHIS, is responsible for enforcing the AWA. *See* 7 U.S.C. §§ 2131 *et seq.*; 9 C.F.R. §§ 1.1 *et seq.* Regulated entities must either maintain a license or registration with the agency and are required to provide adequate care to their animals as specified by AWA regulations. *See* 9 C.F.R. §§ 2.1 *et seq.*, 3.1 *et seq.*

APHIS's enforcement of the AWA generates important records that it routinely published in searchable databases over the course of many years. First, the Animal Care Information Search ("ACIS") database included annual reports required to be submitted by animal research facilities and inspection reports for all regulated entities. The ACIS database allowed users to search for documents by date, type of facility, type of animal, geographic location, name of facility, customer name, or license or registration number and generated a list of hyperlinks to individual

1

PDF documents according to the search. Ex. 1, Liebman Decl. ¶¶ 3, 4. Second, APHIS maintained a database of Enforcement Actions ("EA"), where it uploaded five types of enforcement documents that APHIS generates in response to AWA violations: official warning letters; voluntary settlement agreements between APHIS and regulated entities; administrative complaints filed against a regulated entity to initiate a formal administrative enforcement proceeding before the USDA's Office of the Administrative Law Judge ("OALJ"); consent decisions before the OALJ; and final OALJ decisions. The final two categories—consent decisions and final decisions of the OALJ—are also published on the OALJ's website. The EA database page had a tree structure, where users would click on a year, then a month, and then finally the type of document of interest, which were presented in individual hyperlinks to PDFs. Ex. 1, Liebman Decl. ¶¶ 5, 6.

On February 3, 2017, in violation of its public disclosure obligations under FOIA and without any rational justification, USDA blocked public access to the ACIS and EA databases (collectively, the "APHIS databases"). In so doing, USDA ironically announced that, based on its "commitment to being transparent," it was "implementing actions to remove documents." USDA, *Animal Welfare Enforcement Actions*, https://www.aphis.usda.gov/aphis/ourfocus/animalwelfare/ enforcementactions (last modified on Mar. 3, 2017). Despite the APHIS records having been freely and publicly available to be viewed and downloaded for many years, USDA also cited privacy concerns in removing them.

Public access to the APHIS databases is still blocked, and, by its own admission, USDA has not posted all of the AWA records once publicly available in the APHIS databases. *See*, USDA, *AWA Inspection and Annual Reports*, https://www.aphis.usda.gov/aphis/ourfocus/ animalwelfare/sa_awa/awa-inspection-and-annual-reports (last modified Mar. 10, 2017) (the March 10 update states "APHIS expects it may be several weeks before it will be prepared to issue its next update"); *see also* Ex. 1, Liebman Decl. ¶ 13 (providing an example of missing inspection reports). In the meantime, USDA directs the public to submit FOIA requests for the records that were once published in the APHIS databases. USDA, *Animal Welfare Enforcement Actions*, https://www.aphis.usda.gov/aphis/ourfocus/animalwelfare/enforcementactions (last

modified Mar. 3, 2017). Yet, in 2016—when the APHIS databases were online and available to the public—the agency was unable to process FOIA requests within the twenty business-day timeframe required by statute. 5 U.S.C. § 552(a)(6)(A). For simple requests, it took 93 days, on average, for APHIS to respond; for complex requests, the average rose to 233 days. In one case it took APHIS over three years to respond. USDA, *Department of Agriculture Freedom of Information Act Annual Report for Fiscal Year 2016*, at 22, https://www.dm.usda.gov/foia/reading.htm#reports (follow "DOCX" hyperlink for USDA Annual FOIA Reports 2016).

The Plaintiffs are all non-profit organizations dedicated to animal welfare. As discussed further in Section B.1, each Plaintiff used the APHIS databases in their day-to-day operations and in their advocacy efforts. Without access to the APHIS databases the Plaintiffs have been forced to divert their resources to submitting and managing FOIA requests and several of the Plaintiffs' past and ongoing efforts to protect animals are now in jeopardy—settlement agreements rendered unenforceable, legislation made moot, and advocacy projects scuttled. Without a preliminary injunction, the Plaintiffs will continue to suffer irreparable and exponentially detrimental consequences for every day that they do not have access to the APHIS databases.

## III.   STATEMENT OF ISSUES

Whether an injunction should be entered precluding Defendants from blocking public access to the APHIS databases where there is a strong likelihood that the Defendants are violating their public disclosure obligations under FOIA and where the Plaintiffs will suffer irreparable harm if an injunction does not issue.

## IV.   ARGUMENT

To obtain a preliminary injunction, the moving party must establish (1) a likelihood of success on the merits, (2) a likelihood of suffering irreparable harm absent a preliminary injunction, (3) that the balance of equities tips in the movant's favor, and (4) that an injunction would serve the public interest. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). These four factors tip decidedly in Plaintiffs' favor, and an injunction is particularly warranted in light of the Ninth Circuit's "sliding scale" approach to this standard. *Id.* at 1134–35. Under this

3

approach, "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *Alliance for the Wild Rockies*, 632 F.3d at 1131. Where the likelihood of success is such that "serious questions going to the merits [a]re raised," and the "balance of hardships tips sharply in the plaintiff's favor," a preliminary injunction is appropriate. *Id.*

A preliminary injunction is not a preliminary adjudication on the merits, but a device for preserving the status quo and preventing the irreparable loss of rights before judgment. *Textile Unlimited, Inc. v. A..BMH & Co.*, 240 F.3d 781, 786 (9th Cir. 2001). Here, Plaintiffs seek a preliminary injunction to preserve "the last, uncontested status which preceded the pending controversy," namely, to preserve the public's longstanding and uncontested access to the continually updated AWA enforcement records contained in the APHIS databases. *N.D. ex rel. Parents v. Haw. Dep't of Ed.*, 600 F.3d 1104, 1112 n.6 (9th Cir. 2010) (concluding that an injunction to prevent the continuing implementation of a contested policy announced prior to the litigation was a prohibitory injunction to maintain the *status quo ante*). Preliminary injunctions have been used on many occasions to enforce the public's rights under FOIA. *See, e.g.*, *Martins v. U.S. Citizenship & Immigration Servs.*, 962 F. Supp. 2d 1106, 1130 (N.D. Cal. 2013) (issuing a preliminary injunction for the government to produce an expedited *Vaughn* index); *Elec. Frontier Found. v. Office of the Dir. of Nat'l Intelligence*, 542 F. Supp. 2d 1181, 1187 (N.D. Cal. 2008) (issuing a preliminary injunction requiring expedited processing of plaintiff's FOIA requests).

## A.    Plaintiffs Will Likely Succeed on the Merits of Their Claims.

### 1.    Defendants have failed to make records affirmatively available as required by the Freedom of Information Act.

"The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978). While FOIA is most well-known for its provision allowing anyone to file a request for agency records, equally important to its goal of promoting agency oversight is its so-called "reading room" provision. This provision requires each agency to make affirmative disclosures of enumerated categories of

4

records "available for public inspection in an electronic format," without waiting for a FOIA request from the public. 5 U.S.C. § 552(a)(2). Legislative history demonstrates that an "underlying goal" of the 1996 Electronic FOIA Amendments was to "encourage on-line access to Government information," which would give the public direct access to popular records and result in better use of the federal government's scarce FOIA resources. H.R. Rep. No. 104-795, at 11 (1996). FOIA creates a right of action for broad injunctive relief, giving this court "jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant." 5 U.S.C. § 552(a)(4)(B). The use of the disjunctive "and" between the two clauses demonstrates that this court's power goes beyond merely ordering production of records to plaintiffs or to individual FOIA requesters but allows this court to remedy violations of FOIA's affirmative disclosure obligations as well.[1]

### a. All records in the APHIS databases constitute frequently requested records required to be made affirmatively available under FOIA.

One category of records required to be affirmatively disclosed in a reading room are frequently requested records. A record falls in this category if it has "been previously released to any person" in response to a FOIA request and if the agency determines that "because of the nature of their subject matter, [the records] have become or are likely to become the subject of subsequent requests for substantially the same records" or if the record has been requested "three or more times." 5 U.S.C. § 552(a)(2)(D); *see also* Michael Herz, *Law Lags Behind: FOIA and Affirmative Disclosure of Information*, Cardozo Pub. L. Pol'y & Ethics J. 577 (2009). USDA's own FOIA regulations specify that in deciding whether records are likely to become the subject of subsequent requests, the agency should consider "[p]revious experience with similar records" as well as the "number of requesters and whether there is widespread . . . interest in the records." 7 C.F.R. § 1.4(a)(4). The records that USDA previously published on a continuing basis in the APHIS databases are frequently requested records that must be made affirmatively available in electronic format.

---

[1] Were this Court to conclude that FOIA does not provide authority to order the agency to publish records to satisfy its reading room obligations, there would be no other adequate remedy and the APA would provide a cause of action for the same. *See* 5 U.S.C. §§ 702, 704, 706.

MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 3:17-cv-00949

There is abundant evidence that all of the records have been the subject of repeated requests in the past, including by APHIS's own admission. In 2009, APHIS publicly stated that the AWA inspection reports "were the most frequently requested APHIS records under the FOIA and making them available on our Web site will go a long way toward informing the public of our commitment to animal welfare, while also supporting our FOIA backlog reduction efforts." USDA APHIS, *Letter from APHIS Acting Administrator and Associate Administrator to APHIS Management Team and Program Leaders Group* (June 19, 2009), *available at* https://www.aphis.usda.gov/foia/downloads/APHIS%20Committment%20to%20Transparency.pdf. Also, in 2014, APHIS responded to a FOIA request for "all USDA enforcement actions" under the AWA for a particular region by stating: "[t]he requested records are *frequently requested* and as a result, APHIS, in compliance with the Electronic Freedom of Information Act Amendments of 1996, made the determination to provide the requested records on its agency website." Ex. 1, Liebman Decl., ¶ 18, Ex. J (emphasis added).

APHIS's FOIA logs confirm frequent requests across all of these categories of records, even when the APHIS databases were available for public access. As an example, in January 2016, out of 172 FOIA requests, at least 54 requested AWA inspection reports for a specific facility (sometimes along with other records). USDA, *FOIA Logs*, https://www.aphis.usda.gov/aphis/resources/foia/ct_foia_logs (follow 2016 "January" hyperlink). As to enforcement records, 5 requests that month asked for all enforcement records regarding specific facilities, sometimes including multiple facilities in one request. *Id.* Moreover, whole categories of records previously published on the databases were also routinely requested. *Id.* (showing two requests for categories of inspection records); *id.* (follow 2016 "February" hyperlink) (showing two requests for categories of enforcement actions). To be clear, these are just samples of the types of requests that can be found throughout the seven years of FOIA logs posted on the APHIS website.

Notably, it would be reasonable to assume that once plaintiffs are able to engage in discovery, agency records would show that many more such requests are being made now that the public does not have access to the databases. Plaintiffs themselves have collectively filed sixteen such FOIA requests since the February 3, 2017 removal of the databases, and will continue to file

MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 3:17-cv-00949

requests for categories of records previously in the databases so long as they remain unavailable. Ex. 1, Liebman Decl. ¶¶ 15, 17; Ex. 2, Budkie Decl. ¶¶ 8, 11; Ex. 3, Howard Decl. ¶ 10; Ex. 4, Olson Decl. ¶¶ 12, 14.

Plaintiffs can also show strong evidence that the government has "previously released" all such database records in response to FOIA requests. *See* 5 U.S.C. § 552(a)(2)(D). When the databases were public, the agency routinely responded to FOIA requests for records within those databases not by releasing the records to the requester, but by directing the requester to the online APHIS databases. Ex. 1, Liebman Decl. ¶ 18, Ex. J (providing copies of four such response letters from USDA). These response letters demonstrate that the records published in the databases are done so not only to satisfy the reading room requirements under FOIA, but as a response to any relevant FOIA request for the same records.

USDA regulations provide only one condition under which the agency may remove frequently requested records that have already been made available for public inspection: "Agencies may remove a record from this access medium when the appropriate official determines that it is unlikely there will be substantial further requests for that document." 7 C.F.R. § 1.4(f). In the agency's public statements about the removal of the databases from the public domain, no finding, statement, or rationale of this nature was articulated. *See* USDA, *Animal Welfare Enforcement Actions*, https://www.aphis.usda.gov/aphis/ourfocus/animalwelfare/enforcementactions (last modified Mar. 3, 2017). In fact, given the substantial evidence in the public domain about the frequent nature of these requests, such a finding, had it been made, would be plainly unsupportable.

      **b.**      **In the alternative, the vast majority of records in the APHIS databases constitute agency orders required to be made affirmatively available under FOIA.**

Plaintiffs are likely, in the alternative, to show that the Defendants violated FOIA by not affirmatively disclosing previously published records which are "orders." FOIA requires agencies to make affirmatively available, in an electronic format, "final opinions, including concurring and dissenting opinions, as well as orders, made in the adjudication of cases." 5 U.S.C. § 552(a)(2)(A). The statute defines "orders" as "the whole or part of a final disposition, whether

7

affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making." 5 U.S.C. § 551(6). This provision "represents a strong congressional aversion to 'secret (agency) law,'" and covers "final dispositions of matters by an agency." *NLRB v. Sears, Roebuck, & Co.* 421 U.S. 132, 153–54 (1975).

In *NLRB v. Sears, Roebuck, & Co.*, the Supreme Court considered so-called "advice" and "appeals" memoranda, which the office of the general counsel at the NLRB produced to advise an NLRB regional director about whether to issue a complaint in response to an employer's or union's charge of an unfair labor practice. 421 U.S. at 138–42. The Court concluded that those advice and appeals memorandum that directed the regional director not to issue a complaint ended an inquiry into an alleged labor violation and thus constituted an "order" that had to be affirmatively disclosed under FOIA. *Id.* at 158–59. Similarly, the Ninth Circuit has affirmed a district court decision that "engineering and valuation reports" prepared by foresters during a disputed audit of an individual taxpayer constituted "orders" of the agency because such a report "is the agency's final opinion on the valuation of timber." *Willamette Indus., Inc. v. United States* 530 F. Supp. 904, 906 (D. Or. 1981), *aff'd* 689 F.2d 865 (9th Cir. 1982).

Several categories of records previously published in the APHIS databases likewise constitute the final disposition of the agency in the investigation of a possible AWA violation. Specifically, according to APHIS, when it issues official warning letters or enters into a voluntary settlement agreement with an alleged violator, it "closes the investigative file." USDA, *Investigative and Enforcement Process*, https://www.aphis.usda.gov/aphis/ourfocus/business-services/ies/ies_processes (last modified Oct. 28, 2016). Unlike a report that an investigator prepares for the agency's enforcement staff, these enforcement actions are the final actions by the agency, not merely tentative or interlocutory documents.

Inspection reports are similarly final orders. These reports document whether the agency found any AWA violations and instruct licensees or registrants on any corrective actions that must be taken. In fact, APHIS has created a process for a regulated entity to appeal its inspection report, thereby demonstrating that these reports state the agency's definitive position on the violations found. *See* USDA, *Appeals Process* (July 2014), https://www.aphis.usda.gov/

8

publications/animal_welfare/2014/ appeals_process.pdf. Moreover, a prior AWA violation (in an inspection report or warning letter) warrants more stringent enforcement consequence for subsequent violations. *See* USDA, *Checklist for Animal Care Inspection Report*, at 11, *available at* https://www.aphis.usda.gov/animal_welfare/downloads/Inspection_Requirements_Attachments.PDF.

The agency's final decisions on whether a violation of the AWA has occurred and what enforcement action is taken fall squarely into the category of records that must be released under FOIA. Precisely as Congress intended, the publication of these records allows the public to ascertain the government's interpretations and enforcement of the AWA and to hold the agency accountable in vigorously enforcing the act to prevent animal cruelty. Plaintiffs themselves use the records for this very purpose. *See, e.g.,* Ex. 3, Howard Decl. ¶ 8 (describing how CAPS compares APHIS database records with CAPS's own investigations and refers discrepancies to USDA's Office of the Inspector General, and how this work has resulted in a scathing OIG report about APHIS's administration and enforcement of the AWA).

    **2.**    **Defendants acted arbitrarily and capriciously in violation of the Administrative Procedures Act by suddenly removing databases from the APHIS website that have been continually published for years in the name of "transparency."**

Plaintiffs alternatively have a likelihood of success in demonstrating that APHIS, by removing public access to the APHIS databases, violated the Administrative Procedures Act ("APA"). FOIA's reading room provision is a legal requirement for agencies to take affirmative actions. If agencies fail to make electronically available to the public the required categories of records, they have violated the law. 5 U.S.C. § 552(a)(2)(D). However, irrespective of whether the agency is failing to act in accordance with the reading room requirements, the wholesale removal of previously published databases from the public domain constitutes an independent final agency action that cannot be undertaken arbitrarily.

    **a.**    **Removal of the databases constitutes a final agency action.**

The APA makes reviewable any "final agency action for which there is no adequate remedy in a court." 5 U.S.C. § 704. Because FOIA does not provide a remedy for an agency's

9

discretionary removal of databases from the public domain, there is no other adequate remedy for such an action taken arbitrarily. In addition, an agency action is final where the action "mark[s] the consummation of the agency's decisionmaking process" and is "one by which rights or obligations have been determined, or from which legal consequences will flow." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807, 1813 (2016) (quoting *Bennett v. Spear*, 520 U.S. 157, 177–78 (1997)). The agency's actions here are final and thus reviewable under the APA.

First, USDA's decision to remove the APHIS databases from public domain marks the "consummation" of the agency's decision making process because the agency actually acted on its decision and removed access to the databases. Indeed, the agency issued a statement accompanying its removal of the databases from the website, in which it explained it "*is implementing* actions to remove documents it posts on APHIS' website." *See* USDA, *Animal Welfare Enforcement Actions*, https://www.aphis.usda.gov/aphis/ourfocus/animalwelfare/enforcementactions (last modified Mar. 3, 2017). There is nothing "tentative" or "interlocutory" about the agency's action, despite the agency's assertion that its decisions to block access to the APHIS databases "are not final." *Id.* To determine if the agency's decision is final, a court must consider "the effect of the action and not its label." *Abramowitz v. EPA*, 832 F.2d 1071, 1075 (9th Cir. 1987), *superseded by statute on other grounds as recognized by Hall v. EPA*, 263 F.3d 926, 937 (9th Cir. 2001); *see also Sackett v. EPA*, 566 U.S. 120, 127 (2012) ("The mere possibility that an agency might reconsider in light of 'informal discussion' and invited contentions of inaccuracy does not suffice to make an otherwise final agency action nonfinal."). USDA has taken actions based on its decision and has blocked the APHIS databases from public access, illustrating the consummation of its decision.

Second, USDA's decision to block public access to the APHIS databases has immediate legal consequences. The Supreme Court takes a "pragmatic" approach to finality. *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807, 1815 (2016). In *Navajo Nation v. U.S. Dep't of Interior*, the Ninth Circuit concluded that an agency's decision that a certain statutory scheme applied to particular Native American remains and objects had immediate legal consequences because it delayed the Navajo Nation's access to those items by a period of months. 819 F.3d

10

1084, 1091 (9th Cir. 2016). Here, USDA has blocked the public's ability to immediately access important AWA inspection and enforcement records and instead directed those seeking the previously available documents to "submit Freedom of Information Act requests for that information." USDA, *Animal Welfare Enforcement Actions*, https://www.aphis.usda.gov/aphis/ourfocus/animalwelfare/enforcementactions (last modified Mar. 3, 2017). USDA's action here has the effect of delaying—by months and sometimes by years—the public's ability to access critical records about the government's enforcement of animal welfare laws, which sometimes reveal serious instances of animal neglect or abuse.

### b.   The agency's decision to remove the APHIS databases is arbitrary, capricious, and an abuse of discretion.

Even when an agency retains discretion over a decision, it may not make a choice that is "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A). Although the court's scope of review under the APA's arbitrary and capricious standard is "narrow," the court is tasked with "ensuring that agencies have engaged in reasoned decisionmaking." *Judulang v. Holder*, 565 U.S. 42, 53–54 (2011). Reasoned decision making exists where there is a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983). This inquiry requires the court to examine the reasons for agency decisions—or, as the case may be, the absence of such reasons. *Judulang*, 565 U.S. at 53 (citing *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) for "the requirement that an agency provide reasoned explanation for its action"). The court must rely on the reasons given by the agency and cannot "supply a reasoned basis for the agency's action that the agency itself has not given." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)). Importantly, a court must not "rubber-stamp . . . administrative decisions . . . that frustrate the congressional policy underlying a statute." *Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife*, 273 F.3d 1229, 1236 (9th Cir. 2001) (quoting *NLRB v. Brown*, 380 U.S. 278, 291–92 (1965)) (first omission in original).

USDA stated that it removed the APHIS databases from the public domain "based on [its] commitment to being transparent, remaining responsive to [its] stakeholders' informational needs,

MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 3:17-cv-00949

and maintaining the privacy rights of individuals." USDA, *Animal Welfare Enforcement Actions*, https://www.aphis.usda.gov/aphis/ourfocus/animalwelfare/enforcementactions (last modified Mar. 3, 2017). It further stated that it was removing "documents . . . that contain personal information" and redacting lists of licensees and registrants under the AWA "to ensure personal information is not released to the general public." *Id.* In short, USDA provided three reasons for its decision to remove the APHIS databases: transparency, meeting stakeholders' informational needs, and privacy concerns.

The first two reasons are patently inconsistent with the agency's actions of removing public access to the APHIS databases. Transparency is not increased by removing public access to information. The very opposite is true. As evidenced by FOIA's legislative history, transparency is achieved by greater public access to government records. Similarly, it is not logical that an agency is "meeting stakeholder's informational needs" by removing the stakeholders' access to information.

The third stated reason, privacy concerns, also cannot justify removal of the databases given the agency's prior inconsistent actions with respect to the records contained therein. First and foremost, APHIS had already routinely redacted the records to remove personally identifying information pursuant to 5 U.S.C. § 552(b)(6), (7)(C), thereby obviating any privacy concern. *See, e.g.*, Ex. 1, Liebman Decl. ¶ 3, Ex. A. Second, the records that were already published in the databases had been available for the general public to view, publicize, or copy on an ongoing basis for many years. The agency is effectively trying to "unring a bell" by removing documents that have previously been released to the public, some significant subset of which is undoubtedly already in the hands of any number of private parties. Finally, to the extent that any specific records implicated privacy concerns that were identified by the agency, the decision to remove the entire universe of records in the APHIS databases is an incredibly overbroad response. Given that the same privacy laws that apply today were in effect at the time these records were published, there is no new privacy interest that could have arisen recently so as to form a reasonable basis for the agency's action.

MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 3:17-cv-00949

The agency has not provided a reasonable explanation for its actions, and thus its decision to block public access to the APHIS databases is a final agency action that is arbitrary, capricious, and an abuse of discretion.

**B.    Plaintiffs Will Suffer Irreparable Harm from Defendant's FOIA and APA Violations Absent a Preliminary Injunction.**

**1.    Plaintiffs' diversion of resources and frustration of mission from Defendant's FOIA and APA violations is irreparable harm because neither statute provides compensatory damages.**

Access to the records stored in the APHIS databases is critical to the Plaintiffs' missions. *See* Ex. 1, Liebman Decl. ¶¶ 2, 24; Ex. 2, Budkie Decl. ¶¶ 2, 18; Ex. 3, Howard Decl. ¶¶ 2, 20; Ex. 4, Olson Decl. ¶¶ 2, 20. The diversion of an organization's resources "constitutes far more than simply a setback to the organization's abstract social interests." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). Indeed, diversion of resources and frustration of mission are compensable injuries. *See Fair Hous. of Marin v. Combs*, 285 F.3d 899, 905, 906 (9th Cir. 2002) (affirming such an award of compensatory damages). Although economic harms are generally not considered irreparable harm, economic harms are irreparable where, as here, compensatory damages are not available because the wrongdoer is protected by sovereign immunity. *Idaho v. Coeur d'Alene Tribe*, 794 F.3d 1039, 1046 (9th Cir. 2015); *Cal. Pharmacists Ass'n v. Maxwell-Jolly*, 563 F.3d 847, 851–52 (9th Cir. 2009), *modified on other grounds*. Here, neither FOIA nor the APA waives sovereign immunity as to compensatory damages. *Roman v. Nat'l Reconnaissance Office*, 952 F. Supp. 2d 159, 163 (D. D.C. 2013) ("FOIA does not provide for monetary damages."); *Cohen v. United States*, 650 F.3d 717, 735 (DC Cir. 2011) ("The APA does not offer any monetary award."). Because Plaintiffs can never be made whole for the diversion of their resources and frustration of their mission, any such harm that continues to result from USDA's blocking public access to the APHIS databases pending a final adjudication on the merits is irreparable harm, warranting a preliminary injunction.

Plaintiffs have already had to divert resources and will continue to have to do so for as long as APHIS continues to block public access to the databases. Each plaintiff organization has already filed FOIA requests—to date, collectively totaling sixteen requests—for records that were

MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 3:17-cv-00949

previously published as part of the databases, and will have to file regular requests for as long as the databases are withheld from the public. Ex. 1, Liebman Decl. ¶¶ 15, 17; Ex. 2, Budkie Decl. ¶¶ 8, 11; Ex. 3, Howard Decl. ¶ 10; Ex. 4, Olson Decl. ¶¶ 12, 14. At ALDF, filing a FOIA request necessitates approximately one hour of staff time to simply submit a request. In addition staff spend time communicating with the agency and tracking the request. ALDF will have to file approximately one request per week for records that were previously made affirmatively available. Ex. 1, Liebman Decl. ¶ 17. SAEN has recently hired an additional staff member, a "document procurement specialist," whose very position was "made necessary in significant part" by APHIS's removal of the databases from the public view. Ex. 2, Budkie Decl. ¶ 11. These diversions represent significant investments that the Plaintiffs could have used for other critical organizational functions.

In addition to the diversion of resources that the FOIA requests entail, obtaining untimely information through FOIA requests—or not obtaining any information at all, as is the current situation, Ex. 1, Liebman Decl. ¶ 15—frustrates the mission of the Plaintiff organizations. To begin, certain ongoing efforts are thwarted. For example, CAPS has a long-running advocacy effort in Southern California to investigate the sources of retail pet stores' animals, in part through the APHIS databases, exposing stores that source from large dog breeders, known as puppy mills, and helping to enact ordinances banning the practice. Ex. 3, Howard Decl. ¶ 3. When USDA took the APHIS databases offline, CAPS was in the middle of working with the city of Riverside on a new ordinance but now cannot access the inspection reports pertaining to the largest pet store in the city, Barkworks, thereby frustrating its ongoing investigative and advocacy efforts. *Id.* at ¶ 9. ALDF is currently suing that same Barkworks pet store chain for misrepresenting puppy mills as "reputable" breeders. Ex. 1, Liebman Decl. ¶ 9. ALDF's inability to access timely reports from the APHIS databases will impair its ongoing monitoring of the sources of Barkworks' puppies and ALDF's case. *Id.*

Similarly, a core aspect of Animal Folks' work is filing law enforcement complaints under state cruelty laws and filing complaints to state licensing authorities or APHIS. Ex. 4, Olson Decl. ¶ 4–5. To accomplish this, Animal Folks spent between two and four hours each week checking

14

the APHIS databases for records to support the complaints. *Id.* at ¶ 3. Because law enforcement typically only considers timely complaints, a delay in receiving records will hinder Animal Folks in its ongoing efforts to file complaints. *Id.* at ¶ 6. In another example, the Executive Director of Animal Folks recently testified before a city council about a pet store ordinance and was unable to access the most recent inspection reports for certain breeders, rendering the data presented out-of-date. *Id.* at ¶ 11. For its part, SAEN typically checked the APHIS databases up to ten times per day. Ex. 2, Budkie Decl. ¶ 3. SAEN estimates that it has been unable to review dozens of inspection reports it would otherwise have monitored. As a result, it is also unable to publicize instances of serious animal abuse to pressure animal research facilities to improve their treatment of animals. *Id.* at ¶¶ 17–18.

Furthermore, two of the Plaintiffs have achieved previous victories for animals that are now in jeopardy because they depend on public access to the APHIS databases. Plaintiffs are now forced to choose between frustration of their mission to protect animals or dedicating additional resources to revisiting previous campaigns. For example, CAPS has worked to enact certain local ordinances that rely on access to the APHIS databases. One such ordinance in New York City requires that retail pet stores keep the two "most recent" inspection reports for the breeder of each animal so that prospective purchasers can review the reports and to provide copies of the reports to purchasers. Ex. 3, Howard Decl. ¶ 6. The New York City ordinance also requires that retail pet stores not buy any puppies or kittens from a facility that has a certain number of AWA violations over a period of time. *Id.* Without access to the APHIS databases, the retail pet stores will not be able to fully comply with the ordinance. *Id.* Another ordinance that CAPS helped to enact requires pet stores in Orland Park, Illinois, to post the website link to the APHIS database so that consumers can conduct their due diligence on the breeder. This link now sends the consumer to an error message, rather than the databases. *Id.*

ALDF, for its part, facilitated a settlement that it cannot completely enforce without access to the APHIS databases. ALDF used the APHIS databases to demonstrate that a Chicago-area pet store, Furry Babies, misrepresented puppies it obtained from puppy mills as coming from reputable breeders. Ex. 1, Liebman Decl. ¶ 8. After ALDF filed suit for violations of consumer

protection laws, Furry Babies agreed to use the APHIS databases on a monthly basis to ensure that its breeders' last inspection reports contain no critical or direct AWA violations. *Id*. at ¶ 8 & Ex. D. Without access to the APHIS databases, that element of the agreement is frustrated. ALDF's past efforts to protect animals in this instance will have been frustrated and it will be forced to spend additional resources assuring that Furry Babies does not return to its previous practices sourcing animals from unscrupulous dog breeders who mistreat their animals.

In addition, each of the Plaintiffs engages in substantial public and media outreach as part of their core mission to protect the lives and welfare of animals, and this core work is also frustrated by the removal of the databases. *See* Ex. 1, Liebman Decl. ¶¶ 2, 24; Ex. 2, Budkie Decl. ¶¶ 2, 18; Ex. 3, Howard Decl. ¶¶ 2, 20; Ex. 4, Olson Decl. ¶¶ 2, 20. Without access to the databases, the Plaintiffs are unable to use the records to generate media interest to pressure regulated entities to correct violations of the law or to pressure consumers and lawmakers to take action to hold those entities accountable. For example, CAPS has worked with reporters from 20/20, Dateline, CNN, People, Life, and the Rolling Stone on stories concerning the pet shop and puppy mill industries. CAPS has been working on a story about Internet sellers with a national news program, but without access to the APHIS databases, CAPS cannot provide inspection reports for the story. Ex. 3, Howard Decl. ¶ 18. Similarly, in 2016 alone, SAEN was directly responsible for 125 news stories on conditions and treatment of animals in research facilities. Ex. 2, Budkie Decl. ¶ 19. Plaintiffs therefore use the APHIS database records as a key piece in their robust media work, which will be frustrated absent public access to those records.

Finally, Plaintiffs often seek to give their members and supporters actionable items that can affect consumer decisions. For example, CAPS provides its website visitors with instructions on how to find "a USDA-licensed breeding or brokering facility." The link that CAPS has on its website goes to the now-offline database, resulting in an error message for the user. CAPS, *Find a USDA-Licensed Breeding or Brokering Facility*, https://www.caps-web.org/find-a-breeding-facility; *see also* Ex. 3, Howard Decl. ¶ 13. Similarly, ALDF has issued "consumer alerts" about puppy mills, urging consumers not to support unscrupulous dog breeders and to "do your research" about where pet stores puppies come from. *E.g.*, ALDF, *CONSUMER ALERT: Pet*

16

*Stores are No Place for Holiday Shopping* (Dec. 14, 2016), http://aldf.org/press-room/press-releases/consumer-alert-pet-stores-are-no-place-for-holiday-shopping. Plaintiffs' efforts to help consumers protect the lives and welfare of animals through their purchasing decisions will be thwarted until such time as the databases are returned to the public domain.

For so long as the APHIS databases are not publicly available, the Plaintiffs will be forced to divert staff resources to FOIA requests, put advocacy and media efforts on hold, and spend time reconfiguring, where possible, projects, ordinances, and settlement agreements that rely on public access to the APHIS databases. Indeed, harm to the lives and welfare of the animals Plaintiffs work to protect cannot be adequately remedied by money damages and is permanent. *Cf. League of Wilderness Defs. v. Connaughton*, 752 F.3d 755, 764 (9th Cir. 2014) (finding irreparable harm where thousands of mature trees were going to be felled because "[n]either the planting of new seedlings nor the paying of money damages can normally remedy such damage"). Plaintiffs can therefore demonstrate a likelihood of irreparable harm in their diversion of resources and frustration of mission.

### 2.   Plaintiffs' will be irreparably harmed by the loss of member and donor goodwill.

Intangible injuries, such as the loss of goodwill, may constitute irreparable harm. *Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991). For example, irreparable harm has been found where a plaintiff shows that it seeks to protect advertising efforts and goodwill, *id.*, or recruitment efforts and goodwill, *Regents of Univ. of Cal. v. American Broadcasting Cos.*, 747 F.2d 511, 519–20 (9th Cir. 1984), or other harm that is difficult to valuate, *Rent-A-Center*, 944 F.2d at 597. *See also Pacific Radiation Oncology, LLC v. Queen's Medical Center*, 555 Fed. Appx. 730, 732 (9th Cir. 2015) (mem) (finding irreparable harm where a doctor would suffer "harm to relationships with patients" and competitive harm).

Here, the Plaintiffs risk harming their relationship and goodwill with their members, supporters, and donors by being unable to provide up-to-date information regarding animal cruelty. ALDF provides daily website updates to its news stories and recommendations to its members and the general public of animal-friendly businesses. Ex. 1, Liebman Decl. ¶ 21.

Moreover, prior to USDA's decision to remove the APHIS databases, ALDF specifically committed to its donors and members that it was focusing its efforts this year on advocacy against unscrupulous dog breeders and facilities with captive exotic animals. Ex. 5, Wells Decl. ¶ 14. Past fundraising efforts involving such facilities have generated substantial charitable donations to ALDF. *Id*. at ¶¶ 10, 11, 13. Both industries are largely regulated by APHIS under the AWA, and the lack of information about facilities in those industries will significantly stunt ALDF's efforts to satisfy that commitment to its members. *Id*. at ¶ 14.

For its part, SAEN's core work is to publicize instances of animal abuse to create public pressure on bad actors. A substantial amount of the information SAEN acts on has been drawn from the documents previously available in the APHIS databases. Ex. 2, Budkie Decl. ¶¶ 4–6, 12–16. Moreover, SAEN's Executive Director has traced certain significant donations and successful fundraising campaigns directly to the work SAEN has done exposing to the media and the public serious AWA violations, thereby demonstrating the importance of SAEN's visibility and timeliness to its supporters and donors. *Id.* at ¶¶ 19–21.

If the Plaintiffs are unable to provide timely information to its members and consumers in the general public, they will lose their relevance as up-to-date information sources for the people who once relied on them. Moreover, it is likely to lead to diminished charitable donations. This loss of goodwill constitutes irreparable harm, as those individuals no longer will no longer trust the Plaintiff organizations to provide the most relevant information and advocacy.

**C.    The Balance of Hardships and Public Interest Favor an Injunction.**

In weighing the balance of hardships, the court must consider the impact of a preliminary injunction "on each party of the granting or withholding of the requested relief . . . pay[ing] particular regard for the public consequences." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (internal quotations and citations omitted). Here, the equities weigh decidedly in Plaintiffs' favor. All indications suggest that the agency has merely removed the databases from public view, and nothing suggests the agency has destroyed the databases underlying functionality. Accordingly, restoring public access to the databases, i.e. the *status quo ante*, is unlikely to be a burdensome process for the agency. Moreover, retaining the status quo of

18

allowing public access to the databases will not harm the agency, as demonstrated by the many years in which the agency published those records without consequence. By contrast, the Plaintiffs will continue to suffer without access to the databases.

Further, the public interest in maintaining uninterrupted access to these records is substantial. To begin, for every day that passes without access to records that document AWA violations, animal advocacy groups, like Plaintiffs here, and others concerned about animal welfare, cannot take steps to protect animals and prevent cruelty. USDA's own Inspector General has decried APHIS's lackadaisical enforcement of the AWA. *See, e.g.*, USDA OIG, *Animal and Plant Health Inspection Service Oversight of Research Facilities* 2 (Dec. 2014), *available at* https://www.usda.gov/oig/webdocs/33601-0001-41.pdf. Thus, without public oversight, animals kept for commercial enterprises—whose rights to basic necessities such as adequate shelter, food, water, and veterinary care, are guaranteed by statute—will be more likely to suffer. Public outcry has come from every side of the issue, including organizations that support animal research, members of Congress, and local jurisdictions with puppy mill ordinances that cannot be fully enforced. *See* Speaking of Research, *The USDA's Removal of Information About Animal Research is a Step Backwards for Transparency* (Feb. 7, 2017), https://speakingofresearch.com/2017/02/07/the-usdas-removal-of-information-about-animal-research-is-a-step-backwards-for-transparency; *Senators Urge USDA to Restore Animal Cruelty Data to Website*, U.S. NEWS (Feb. 13, 2017), https://www.usnews.com/news/new-jersey/articles/2017-02-13/senators-urge-usda-to-restore-animal-cruelty-data-to-website; Skyler Swisher & Ryan Van Velzer, *County Says Loss of Federal Animal-Welfare Data Hinders Puppy Mill Crackdown* (Feb. 6, 2017), http://www.sun-sentinel.com/local/palm-beach/fl-pn-puppy-mill-info-blackout-20170206-story.html. This flurry of public activity underscores what is common sense: deleting scores of AWA enforcement records used to document animal cruelty in the name of "transparency" is not in the public interest.

## V.     CONCLUSION AND RELIEF REQUESTED

APHIS acted unlawfully in violation of FOIA and the APA when it blocked public access to its ACIS and EA databases, and stopped affirmatively disclosing all recent inspection reports,

19

annual research reports, and enforcement action documents. Accordingly, Plaintiffs seek a preliminary injunction to the *status quo ante*, requiring USDA to continue its years-long practice of allowing public access to the continually updated records in the APHIS databases pending the outcome of the litigation.

DATED: March 29, 2017

By: /s/ *John S. Rossiter*

John S. Rossiter, State Bar No. 151113
JRossiter@perkinscoie.com
Lindsey E. Dunn (*Pro Hac Vice*
Application pending)
LDunn@perkinscoie.com
PERKINS COIE LLP
505 Howard Street, Suite 1000
San Francisco, CA  94105-3204
Tel:  415.344.7000/ Fax: 415.344.7050

Attorneys for Animal Legal Defense Fund

Christopher Berry, State Bar No. 283987
cberry@aldf.org
Matthew Liebman, State Bar No. 248861
mliebman@aldf.org
ANIMAL LEGAL DEFENSE FUND
525 E. Cotati Ave.
Cotati, CA 94931
Telephone:  707.795.2533
Facsimile:  707.795.7280

Margaret B. Kwoka
(admitted Pro Hac Vice)
mkwoka@law.du.edu
UNIVERSITY OF DENVER STURM COLLEGE
OF LAW
2255 E. Evans Ave
Denver CO 80208
Telephone:  303.871.6275
Facsimile:  303.871.6378

Attorneys for Plaintiffs